## THE UNITED FRUIT COMPANY vs. THE NEW YORK AND BALTIMORE TRANSPORTATION COMPANY.

*Carriers—When Liable as Warehousemen After Arrival of Goods at Destination — Goods held by Carrier After Arrival at the Request of Consignee—Appeal—Inconsistent Instructions.*

The liability of a carrier as insurer continues after the arrival of the goods at their destination and until the consignee, after being notified of the arrival, has had a reasonable time in which to remove them.

When the consignee fails to take away the goods within a reasonable time after being notified of their arrival, the liability of the carrier for their custody is that of a warehouseman.

When the facts are undisputed, the question in such case of what is a reasonable time is one of law.

Goods arrived on a Friday morning at the carrier's wharf, and the consignee was notified thereof.    He failed to take them away or accept a delivery of them, and the goods were destroyed by an accidental fire on the following Sunday.    *Held*, that the consignee had had a reasonable time on Friday and Saturday within which to receive the goods, and the carrier is not liable for their loss at a time when they were held by it as warehouseman.

When a carrier is ready to deliver the goods after their arrival but holds them at the request and for the convenience of the consignee, the carrier is thereafter liable for their safe keeping only as a warehouseman.

Goods were shipped to plaintiff, on receipts and not by the uniform bill of lading, on defendant's steamer, which arrived in Baltimore, the destination, early on the morning of Friday, February 5th, 1904.    The defendant, (the carrier,) was accustomed to deliver such goods to the consignee directly, and on the morning of that day notified plaintiff of the arrival of the goods and offered to deliver the same.    Plaintiff requested that the goods be held by the defendant until the following Tuesday.    The defendant agreed to do this, provided the plaintiff would pay for the expense of delivery on that day, and defendant also notified plaintiff that the goods would be at the latter's risk.    The goods were taken from the ship and stored on defendant's wharf where they were destroyed, without any negligence on defendant's part, in the great fire of Sunday and Monday, February 7th and 8th.    *Held*, that the defendant was custodian of the goods as warehouseman and is not liable for the loss so occasioned.

An appellant has no right to complain that a correct instruction to the jury is in conflict with instructions granted at his request which are erroneous.

*Decided December 20th, 1906.*

Appeal from the Superior Court of Baltimore City (SHARP, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Randolph Barton, Jr.,* for the appellant.

*Thos. F. Cadwalader* and *Horace S. Whitman,* for the appellee.

McSHERRY, C. J., delivered the opinion of the Court.

This suit was brought by the appellant, the United Fruit Company, against the appellee, the New York and Bal-

timore. Transportation Company, a common carrier by water,
to recover the value of certain goods and merchandise shipped
from New York to the appellant in Baltimore in one of the
steamers of the appellee, and which after reaching the appel-
lee's dock in Baltimore and after being unloaded thereon from
the steamer and after being stored on the appellee's wharf were
destroyed in the great fire of February, 1904. Part of the
goods were shipped under bills of lading which contained con-
ditions limiting the carrier's liability and which are inserted in
the uniform bill of lading. As no claim is made that the value
of those goods thus shipped can be recovered in this action no
allusion need be made to those conditions. The remainder of
the goods were shipped on simple receipts and it is in respect
of these latter goods that the questions in this case arise. The
steamer reached Union Dock, the Baltimore terminus of the
appellee's line, at half past six on the morning of Friday, Feb-
ruary the fifth, 1904. The goods were not delivered to the
consignee and as their destruction by fire whilst in the posses-
sion of the appellee is the ground of the pending action, it be-
comes necessary to inquire and determine in what capacity
they were held by the appellee at the time of their destruction
and why they were not delivered to the appellant upon their
arrival. To answer these inquiries intelligently a somewhat
detailed statement of the testimony must now be made.

There were but four witnesses examined—two on each side.
The first witness called was C. C. Buckman and his testimony
shows nothing of consequence beyond the fact that as manager
of the appellant company he knew of the arrival of the goods,
but not from personal knowledge; and the further fact that it
was the custom of the appellee to deliver goods to the appel-
lant company at its place of business at Bowley's wharf. The
appellant then produced the witness Irving K. Ward, who tes-
tified that at the time of the fire he was acting auditor of the
appellant; that the appellee always made free delivery to the
appellant company of goods consigned to the appellant in Bal-
timore. That "the representative of the defendant (appellee)
came to the office of the plaintiff (appellant) and saw witness

in person, and stated that he had a shipment of plaintiff's (appellant's) that had arrived on his boat, and he wanted to know when he should make delivery. Witness thinks this was on Friday, the day the boat arrived.   And as these goods were to be shipped to our people in Cuba, and not having a steamer to sail before Tuesday I told him that if he could arrange to hold those goods until Tuesday it would be advantageous to us, and he said he would agree to hold those goods until Tuesday, provided we would pay the tugboat and scowage charge from the New York and Baltimore Transportation wharf to Bowley's wharf as the goods had been shipped to be delivered at Bowley's wharf.   He agreed, in consideration of the fact that we paid the expenses for bringing them around there, that he would hold them, because, as he stated, they were in a boat and to take them out and put them on a scow he could send them around to us very easily, but if he was to keep them there, there would be a double expense, and if we agree to pay the tugboat charge of the time he would agree to keep the goods, which was done."   The Judge then asked the witness, "Do I understand you to say that he promised to deliver them on Friday?" and the answer was: "Yes sir."   "And you agreed to pay the charges."   "Yes sir."   The witness continued: "The ordinary method of making delivery was to bring the goods by drays from the New York Line to Bowley's wharf.   *   *   *   The fire destroyed the goods on Sunday or Monday so they were never delivered.   *   *   *   In consequence of the making of this agreement the goods were not delivered either on Friday or Saturday."   On cross-examination the witness was asked the following questions and gave the following answers:   "When you were notified that these goods had arrived, you say you were not ready to receive them?"   "No sir."   "Was anything said to you or by you about whose risk they were at?"   And he replied:   "I do not recollect anything about a risk being mentioned at all."

The appellee (defendant) then proved by George R. Brown that he was at the time of the fire one of the delivery clerks of the appellee, and had been for twenty years.   The goods

in controversy reached the appellee's (defendant's) wharf
about half past six Friday morning February fifth, 1904.
Witness gave appellant (plaintiff) written notice, "and per-
sonally by phone told appellant they were ready to deliver the
goods. Reply was that plaintiff would not be ready before
Tuesday. Told plaintiff (appellant) they would deliver that
morning if plaintiff could take them. Goods were then on ship."
He was then asked : "When he refused to accept them, what
did you then say ?" and he replied : "I told him they were
entirely at his risk." If the appellant had accepted delivery
the goods would have been taken from the steamer to the
scow. They unloaded the goods and put them on appellee's
pier. The ship had to sail next day. The goods were pro-
perly stored on the pier, in a covered shed, and were then
ready for consignee at any time he wanted them. The light-
ers in which the delivery was to be made are not owned, run
or operated by the appellee but by the Atlantic Transport
Company. The witness further proved that it was the cus-
tom of the appellee to deliver free, first, second and third class
freight ; but that if fourth, fifth or sixth class freight was de-
livered the appellee charged for it. In all car lots, whether
it is free delivery or not the appellee agreed to deliver all car
load freight to consignee's pier if he has a water front whether
it is fourth, fifth, sixth, or first, second or third class. The
appellee further proved by William Riley that in February,
1904, he was notifying clerk of the appellee Company ; that
his duties were to make out notices and take them around and
notify people that goods had arrived on appellee's steamers.
He took notices to the United Fruit Company on February
the fifth of the arrival of all the goods covered by the freight
bills offered in evidence, and delivered them at the appellant's
office. The blank form of notices which was filled out in each
case was as follows : "New York and Baltimore Transporta-
tion Line, Baltimore ——— 190–. Landed this day at the
Bay Line Wharf, foot Union Dock the following goods, sub-
ject to the order and at the risk of —— who —— hereby
notified to remove the same without delay, as all property is

at risk of the owner or consignee after landing on wharf."
He delivered the notices about nine or ten o'clock in the
morning. These notices applied to fourth, fifth and sixth
classes of goods only.

In rebuttal the appellant recalled Irving K. Ward who de-
posed that he did not have the conversation with Mr. Brown
testified to by the latter as a telephone communication. That
no other notification of arrival of these goods reached him ex-
cept the written notice and the verbal conversation that has
been testified to.

The following facts are established by the testimony and
established conclusively and without contradiction : That the
goods in question reached the appellee's wharf early on the
morning of February the fifth : That the appellee was then
ready and willing and offered to deliver them to the consignee
according to its accustomed mode of delivery : That the
consignee received timely notice on the morning of the fifth of
February that the goods had arrived : That it was due to
consignee's express request that the goods be held by the
carrier that they were not delivered on that day : That the
appellee company agreed to hold them until Tuesday *at the
risk of the appellant,* and the latter agreed to defray the ex-
pense of transferring them from the appellee's wharf to the
appellant's wharf in the scows and by the tugs of the Atlantic
Transport Company : ₒ That the goods were destroyed by
fire on February seventh or eighth without any fault or negli-
gence on the part of the appellee ; and that but for the de-
clension of the appellant to accept the goods on the fifth of
February they would not have been burned whilst in the
possession of the appellee. These facts show *why* the goods
were not delivered to the consignee upon their arrival ; and
the remaining inquiry is : in what *capacity* do these facts prove
that the goods were held by the appellee at the time of their
destruction by fire ? And that is the next inquiry because
its solution will determine the rule of law by which the liabil-
ity of the appellee is to be measured.

We all know — it is a familiar doctrine — that a common

carrier of goods is an insurer and is responsible for all losses except those occasioned by the Act of God or public enemies, unless there is some valid contractual restriction of that liability.     If then the goods in controversy — those not covered by the conditions in the uniform bill of lading — were in the custody of the appellee in its capacity as a common carrier; it is liable to the consignee for their value.     On the other hand a warehouseman being a mere bailee, is bound only to ordinary diligence and of course is responsible for losses caused by ordinary negligence.     If then, the goods in question were in the custody of the appellee as warehouseman there is no pretence that it was guilty of any negligence whatever and the consignee would have no cause of action against it for the loss occasioned by the fire.

When the goods were received by the New York and Baltimore Transportation Company in New York for the shipment to Baltimore the duties and resposibilities of a common carrier of freight were at once assumed by it.     Now, when did those duties and responsibilities terminate? and when, if at all, did the less rigorous obligations of a warehouseman begin?     Laying aside for the moment all reference to the special facts of this case and all considerations of custom it will be pertinent to determine, first, what is the general rule of law with regard to the termination of the carrier's liability, as carrier, and the inception of its liability as a warehouseman; and, then, the circumstances of this case will be considered in connection with that general rule.     There is a decided conflict in the authorities as to when the carrier's liablity as such ceases, and its liability as warehouseman only begins.     One class of cases adopts what is known as the Massachusetts rule, whilst another class of cases follows what is called the New Hampshire doctrine.     The Massachusetts rule is this:     When the transit is ended, and the carrier has placed the goods in his warehouse to await the delivery to the consignee, his liability as carrier is ended also, though no notice is given to the consignee, and he is responsible as warehouseman only.     *Thomas* v. *Boston & P. R. Co.*, 10 Met. 472, approved in *Norway*

*Plains Co.* v. *Boston & M. R. Co.*, 1 Gray, 263. This rule has been adopted or followed in Georgia, Illinois, Indiana, Iowa, Missouri, North Carolina, New Jersey and Pennsylvania.

The New Hampshire doctrine holds that the carrier's liability as insurer continues after the arrival of the goods at their destination and until the consignee has had a reasonable time in which to call for and remove them; and that the carrier is bound to notify the consignee of the arrival of the goods, and that the reasonable time does not begin to run until such notice, where practicable, has been given. *Moses* v. *Boston & M. R. Co.*, 32 N. H. 523, where it was said in commenting on the rule laid down in *Norway Plains Co.* v. *Boston & M. R. Co.*, *supra*, that the Massachusetts rule was of "a plain, precise and practical character," but that, "by it the salutary and approved principles of the common law are sacrificed to considerations of convenience and expediency." The lead of New Hampshire has been followed by the Courts of Alabama, California, Connecticut, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Nebraska, New York, Ohio, Vermont and Texas. In the last named State as well as in some of the others the rule is prescribed by statute. *Rev. Stat., Tex.*, Art. 282. See note to *East Tenn., Virg. & Geo. R. Co.* v *Kelly*, 17 L. R. A. 691, where the two rules are discussed and numerous cases are cited. These differences of opinion had their origin in the rule of the common law requiring actual delivery to the consignee by the carrier. A modification of the rule was made necessary on account of the impracticability of actual delivery by railroad companies or carriers by water, and notice to the consignee and a deposit of the goods in the carrier's warehouse were made a substitute for actual delivery. The cases adopting the Massachusetts doctrine proceed on the theory that a deposit of the goods in the carrier's warehouse is a *quasi* delivery to the consignee's agent, and absolves the carrier from all further liability as to the goods, except such as is assumed by its new relation; such a delivery to itself as the consignee's warehouseman being in lieu of the actual delivery required by the common law. The opposing authorities consider that the

changed character of the carrier which renders actual delivery impracticable merely relieves it from such delivery; that it still remains liable until the consignee receives his goods, unless he fails to call for them within a reasonable time.    5 *Am. & Eng. Ency. L.*, 268.

The doctrine of the English cases is substantially the same as the New Hampshire doctrine.    The consignee of goods shipped by railway is entitled to a reasonable time, after the goods have arrived at their destination, within which to take them away, and during such time the goods are in the hands of the railway as carrier and subject to all the liabilities which attach to that character.    But when such reasonable time has lapsed the company becomes liable as warehouseman merely.    *Chapman* v. *Great West. Ry. Co.*, 5 Q. B. Div. 278.    In this case COCKBURN, C. J., said: "The contract of the carrier being not only to carry, but also to deliver, it follows that, to a certain extent, the custody of the goods as carrier must extend beyond as well as precede the period of their transit from the place of consignment to that of destination.    First there is in most instances an interval between the receipt of the goods and their departure—sometimes one of considerable duration.    Next, there is the time which, in most instances, must necessarily intervene between their arrival at the place of destination and the delivery to the consignee, unless the latter— which, however, is seldom the case—is on the spot to receive them on their arrival.    Where this is not the case, some delay, often a delay of some hours—as, for instance, where goods arrive at night, or late on a Saturday, or where the train consists of a number of trucks which take some time to unload—unavoidably occurs.    In these cases, while on the one hand, the delay being unavoidable, cannot be imputed to the carrier as unreasonable, or give a cause of action to the consignor or consignee, on the other hand, the obligation of the carrier not having been fulfilled by the delivery of the goods, the goods remain in his hands as carrier, and subject him to all the liabilities which attach to the contract of a carrier.    *A fortiori* will this be the case where there is unreason-

able delay on the part of the carrier, if the consignee is ready
to receive.    The case, however, becomes altogether changed
when the carrier is ready to deliver, and the delay in the de-
livery is attributable, not to the carrier, but to the consignee
of the goods.    Here again, just as the carrier is entitled to a
reasonable time within which to deliver, so the recipient of the
goods is entitled to a reasonable time to demand and receive
delivery.    *    *    *    When once the consignee is *in mora* by
delaying to take away the goods beyond a reasonable time,
the obligation of the carrier becomes that of an ordinary bailee,
being confined to taking proper care of the goods as a ware-
houseman.    He ceases to be liable in case of accident."

The precise question we are considering does not seem
to have been passed on in Maryland.    We, adopt as the more
reasonable view the New Hampshire rule and the doctrine of
the English cases; and this brings us to inquire what is a rea-
sonable time, within which, after notice to the consignee of the
arrival of the goods, he is required to remove them if he does
not wish the liability of the carrier as such to terminate whilst
the goods are still actually undelivered.    Reasonable time
has been defined as being such time as would enable one who
resided in the vicinity of the place of delivery and was informed
of the probable time of the arrival of the goods and of the
course of the carrier's business, to inspect and remove the
goods during business hours.    5 *Am. & Eng. Ency. L.*, 270,
and cases cited in note 3.    Thus where the consignee was no-
tified after ten o'clock Saturday morning of the arrival of his
goods, and the day was a very stormy one, it was held that a
finding that the following Monday morning was a reasonable
time for removal would not be disturbed on appeal.    *Solomon
v. Phila., &c., Ex. Steamboat Co.*, 2 Daly (N. Y.) 104    In
*Lemke v. Chic., &c., R. R. Co.*, 39 Wis. 449, where it appeared
that the goods arrived at the place of destination on a Satur-
day evening, and were destroyed by an accidental fire on the
Tuesday following about noon, it was held that the owner had
had a reasonable time in which to remove them and that the
company's liability as insurer had ceased.

In the case at bar the goods arrived early on Friday morning and notice of their arrival was given to the consignee sometime before noon of the same day.   There was the rest of that day and the whole of the ensuing day, Saturday, during which the consignee could have removed the goods from the wharf of the appellee.   That period was a reasonable time within which the consignee could have removed the goods. When the facts are undisputed the question of what is a reasonable time is one of law.   6 *Cyc.* 455, note 47.   If there were no other facts in the case than these just mentioned and, these are undisputed, then under the English and the New Hampshire rule, at the close of business hours on Saturday, February the sixth, the goods were held by the appellee, not as carrier, but as warehouseman, and it would not be liable for the loss which was caused by the fire of the seventh or eighth, since there is no evidence that the fire was due to or caused by its negligence.   But there are other facts which must be alluded to before reaching a final conclusion in the case.

Assuming that according to its custom the appellee was obliged to deliver these goods — they forming a car-load lot — to the appellant company at its place of business at Bowley's Wharf, do the facts show that the appellee held the goods at the time of their destruction by fire, as carrier or as warehouseman ?   That question arises on the instruction granted by the trial Court at its own instance.   After the goods had arrived the consignee was promptly notified but because it was then inconvenient for it to receive them it requested the carrier not to deliver them but to hold them until Tuesday following, which the carrier agreed to do *at the risk of the owner* upon the owner stipulating that it would pay the tugage and scowage charges for delivery at its wharf.   Those charges were not to be paid to the appellee but to the Atlantic Transport Company.   These facts are undisputed:   We say the statement that the appellee agreed to hold the goods *at the risk of the consignee* is undisputed, because, first, the written notice declares that they would be at the risk of the

appellant ; and because, secondly, the testimony of the witness Brown is explicit to the effect that he so informed the appellant, whilst the plaintiff's witness Ward merely said that he did not "recollect anything about a risk being mentioned at all." His failure to recollect does not constitute a contradic-·tion of Brown's affirmative statement. There are two propositions resulting from these circumstances. We are not dealing with a flat *refusal* by the consignee after notice to receive the goods. In such an event · the law is well settled that the liability of the carrier as insurer terminates and its liability as warehouseman begins. 6 *Cyc.* 474. The case is one in which/(first) the goods were held by the carrier at the *request* and for the *convenience* of the consignee ; and (secondly) where they were held by the carrier under a distinct agreement that they were at the risk of the owner.

*First.* The carrier is liable only as warehouseman while the goods are held by the carrier at the request and for the convenience of the consignee. 6 *Cyc.*, 456, and cases in note 50; *Story on Bailments*, sec. 541. So where the carrier is ready to deliver the goods, but on account of the lateness of the hour they are left in the depot over night, at the consignee's request, although probably for the convenience of both parties, the carrier remains liable thereafter as warehouseman only, without regard to the length of time that has elapsed since the arrival of the goods. 5 *Amer. & Eng. Ency. L.*, 273, citing *Fenner* v. *Buffalo, &c., R. Co.*, 44 N. Y. 505; *Blumenthal* v. *Brainerd*, 38 Vt. 402. The reason for this is obvious. The carrier is entitled to complete its contract and to release itself from its liability as insurer of the goods, by promptly delivering them upon their arrival. If, being ready and offering to make the delivery, it is induced by the consignee not to perform that part of its duty and not to perform it merely for the purpose of serving the convenience of the consignee, the latter cannot be permitted, should the goods perish after they would have been delivered but for the request that they should not be delivered, to contend that their non-delivery occasioned by their destruction in the interim, was a breach of the

carrier's original duty to deliver. The consignee's request that the carrier should hold the goods beyond the time at which the carrier was ready and had offered to deliver them, cannot, if the carrier complies with that request, prolong the carrier's liability as insurer; because such a request is in effect a request that the carrier store the goods in the meantime. And that is what was in fact actually done. The goods were unloaded from the ship and were stored on the appellee's pier, solely because of that request. The appellant itself proved by one of its own witnesses that it was "in consequence of the making of this agreement the goods were not delivered either on Friday or Saturday." It would be unreasonable to hold the carrier, in such circumstances, to the strict liability of an insurer, because his duty as carrier would be treated, either as at an end, or, as suspended. One case will suffice to illustrate this proposition. It was decided by the Court of Common Pleas during Trinity Term, 1818, and is reported in 8 *Taunt.*, 443 (4 E. C. L. R. 159). It appeared there that Webb & Company were common carriers from London to Frome. They had been in the habit of carrying wool for the Messrs. Shepherds, who used it in their trade as clothiers. Messrs. Shepherds later on entered into an agreement with Webb & Company to carry a larger quantity of wool than usual in consideration that they, the carriers, would receive into their warehouse at Frome the wool they should bring from London *when it was not convenient* for Messrs. Shepherds to take it home, and that the carriers should so receive it without charging Shepherds anything for warehouse room or in any other respect for the keeping of the wool. On the arrival of the wool at Frome it was always sent to the Messrs. Shepherds without delay by the carriers unless they received notice from the Shepherds that it was not convenient for them to receive it. After such notice was given the carriers stored the wool in their warehouse until they were informed that the consignee was ready to have it delivered. There was nothing said at the time this agreement was made as to the party at whose risk the wool was to remain while it was deposited in the car-

rier's warehouse.   On May eleventh, 1816, a quantity of wool belonging to the Messrs. Shepherds was brought by Webb & Company, as carriers, from London to Frome and it not being convenient for Messrs. Shepherds to receive it into their own warehouses, they sent notice to the carriers that they were not to send it home, but to house it in their warehouse.   This was done.   It remained there until June the twenty-first when the warehouse and a considerable part of the wool were destroyed by an accidental fire.   The question upon which the whole case turned was, in what capacity was the wool held by the carriers when it was damaged by the fire? but the particular mode in which that question arose is not material. GIBBS, C. J., after referring to the facts in respect to the holding of the wool by Webb & Company until they were given notice by the owners that the latter were ready to receive it, said: "The consequence is that the character of Webb & Company, as carriers, was suspended from the time of the arrival of the goods at Frome until their delivery to the Messrs. Shepherds; and that during such interval, though the duty of Webb & Company, as carriers, was not discharged, they were not liable as carriers."   BURROUGH, J., said:   "I am of the opinion that the duty of Webb & Company, as carriers, was suspended by the special contract between them and the Messrs. Shepherds, and that the goods were in the custody of Webb & Company, not in their capacity as carriers, but under that special contract."   Whilst DALLAS and PARK, JJ., concurred in the judgment, which exonerated the carrier, on the ground that Webb & Company had completed their duty as carriers and therefore stood in the relation of warehousemen only.   *In re Webb, Wallington, Brown & Brice*, 8 Taunt. 443.

*Secondly.*  The goods were  held by the carrier beyond the time at which the appellee was ready and had offered to deliver them, under a contract or understanding that they were at the risk of the owner during that period.   The testimony on this phase of the case has already been recited and need not be now repeated.   Upon the theory that such an under-

standing has been satisfactorily shown by the evidence, the case of the appellant is at an end.     If the goods were to remain on the wharf of the carrier at the risk of the owner, the obligation of the carrier, as carrier, was discharged; because it could no longer be answerable as carrier and therefore as insurer of the safety of these particular goods which were not covered by the conditions of the uniform bill of lading, if the goods were to be, by the consent of the consignee, at the risk of the consignee during the period they were stored on the carrier's wharf under that agreement.     The attitude of insurer on the part of the carrier, in these circumstances, was incompatible with an assumption by the owner of the risk of the loss of the goods.     As that incompatibility resulted from the voluntary act, of the owner, the owner cannot repudiate the consequence of it and fasten a loss on the carrier when that loss would not have occurred at all if the carrier had been permitted by the consignee to deliver the goods upon their arrival.

The Superior Court granted an instruction to the effect that from the undisputed evidence it appeared that at the time of the loss of the goods by fire the appellee held the same as warehouseman and not as a common carrier; and as there was no evidence legally sufficient to prove that the loss was due to any negligence on the part of the appellee the verdict must be for the defendant — the appellee.     That instruction was properly granted, and though it conflicts with instructions at the instance of the appellant, the latter has, on that account, no reason to complain since the instructions asked by the appellant were themselves erroneous.     We have not considered the exceptions reserved by the appellee because it is unnecessary to do so. We find no reversible error on the appeal of the Fruit Company and the judgment in favor of the Transportation Company will be affirmed.

*Judgment affirmed with costs*
*above and below.*