BARBER *v.* DETROIT, GRAND HAVEN & MILWAUKEE
RAILWAY CO.

1. CARRIERS—TERMINATION OF LIABILITY FOR GOODS SHIPPED—
WAREHOUSES.

A delay of more than 6 days in removing shipments of
potatoes from the terminal warehouse in the winter time,
after notice to the consignees, relieves the carrier from
liability for damages by freezing.[1]

2. SAME.

Where any finding that if the produce had reached its desti-
nation within the time required it would not have been
frozen would be mere conjecture, the carrier was not
liable.

Error to Ionia; Davis, J. Submitted April 13, 1917.
(Docket No. 11.)   Decided September 27, 1917.

Case by Thomas S. Barber and others, copartners
as the Saranac Produce Company, against the Detroit,
Grand Haven & Milwaukee Railway Company for the
freezing of potatoes in transit.   Judgment for plain-
tiffs.   Defendant brings error.   Reversed, and no new
trial ordered.

*Harrison Geer* (*W. K. Williams* and *L. W. Smith,*
of counsel), for appellant.

*Ellis & Ellis, J. Clyde Watt* and *R. A. Colwell,* for
appellees.

MOORE, J.   Thomas S. Barber, Gilbert Ayers, Win-
field S. Allen, and Charles E. Huhn, copartners doing
business under the name of the Saranac Produce Com-

---

[1] For authorities passing on the question as to what is a rea-
sonable time for removal of goods by consignee, after which
the liability of the carrier as such terminates, see notes in 8
L. R. A. (N. S.) 240; 16 L. R. A. (N. S.) 935; 25 L. R. A. (N.
S.) 938.

pany, brought this action May 8, 1915, seeking to recover damages for a loss through the freezing of potatoes shipped during the winter of 1911-1912; two cars were consigned to Norfolk, Va., and two to Pittsburg, Pa. From a judgment for the plaintiffs of $1,-324.27, the case is brought here on writ of error.

The errors relied upon are discussed under the following heads:

(1) The judge erred in refusing to direct verdict for defendant as requested.

(2) The judge erred in holding there was a question for the jury as to whether there has been a deviation from the route which had orally been agreed upon or understood between the carrier and Mr. Huhn, manager for plaintiffs.

(3) It was error to submit the question of whether there had been an oral agreement as to the routing which the Norfolk shipments should take.

(4) It was error to hold that the burden of proof was on defendant to show the plaintiffs understood the routes inserted in the bills of lading covering the Norfolk shipments.

(5) It was error to submit to the jury the question of defendant's liability for the Pittsburg shipments.

(6) It was error for the trial judge to charge the jury that demurrage is an extension of freight rates.

It was the claim of the plaintiffs that they had shipped produce in refrigerator cars furnished by defendant which was carried through to Norfolk in the same car into which it was loaded at Saranac. They claim they ordered two refrigerator cars for potatoes to go to Norfolk, and that the agent knew for what purpose they were ordered; that the cars were furnished and were loaded with potatoes, and the plaintiff in each instance made out a bill of lading in triplicate, giving the number of the car, its contents, and the destination of the shipment, but did not put in the route by which the shipment would be made. The bill of lading was then turned over to the local agent of

the defendant, who put in the route the shipment was to take and signed the triplicates, retaining one and returning the other two to the plaintiffs. The plaintiffs claim that the two cars were ordered and loaded as through cars to Norfolk, Va., and that the agent should have so routed them, and that instead of doing so he routed them so that the cars went only to Baltimore, where the potatoes were transferred to a packet steamer which conveyed them to Norfolk. Defendant claims plaintiffs knew just how the potatoes were routed. This claim will be stated more in detail later.

We quote from the brief of counsel for the plaintiff:

"Plaintiffs claim from the above statement of facts, that, they having selected the mode of transportation, to wit, in refrigerator cars, such mode should not be changed by the defendant, and while the defendant was entitled to send the refrigerator cars over any line which could transport such cars, and which would be equally advantageous to the plaintiffs, it was not authorized to send said potatoes, unprotected by refrigerator cars, on a packet line, and defendant was not authorized to use a line over which cars could not be sent, and therefore the defendant wrongfully changed the mode or manner of shipment, and used that as an excuse to ship the produce over a line not authorized, and by reason of the change of mode of shipment, defendant became an insurer, and that while the plaintiffs should conduct themselves as an ordinary prudent man would to make the damages as small for the defendant as they reasonably could, still the entire net loss occasioned by the change of method and route of shipment must fall upon the defendant."

The trial judge charged the jury in part as follows:

"One of the first things for you to consider in this case and determine is: What was the contract between the plaintiff and the defendant relative to the shipments made to Norfolk, Va.? If you find from the evidence that the plaintiff ordered refrigerator cars to ship potatoes in to be delivered on the railroad

tracks at Norfolk in the cars, and that the defendant by its agent furnished the cars for that purpose, and that they were loaded with potatoes as agreed by the parties, and that after they were loaded and the cars closed the plaintiff took to the defendant's agent a statement containing the contents of the cars, or car, as the case might be, one at a time, and that the defendant knew that the plaintiffs intended and had directed that the cars should be shipped by rail to Norfolk, then it was the duty of the defendant to ship the cars by rail to Norfolk, and the defendant would have no right to ship them any other way without the knowledge or consent of the plaintiffs. The fact, if you find it to be a fact, that the agent of the defendant inserted a different routing in the bills of lading and turned the same over to the plaintiffs, or their agent, would have no force or effect in this case, unless you find that before the goods were shipped the effect of such routing, and that such routing would amount to sending the cars part of the way by rail and the contents the rest of the way by water, was understood and known to the plaintiffs, and they consented thereto (when I say plaintiffs I mean Mr. Huhn; whatever was done by Mr. Huhn was done by the plaintiffs he represented). That is to say, if the plaintiffs had made an oral contract or agreement where and how these cars should be shipped and they loaded the cars with that intention and under such contract, then they had the right to rely on the oral contract, and if the defendant by its agent inserted a different routing without the knowledge or consent of the plaintiffs, such routing in the bill of lading would have no force or effect in this case; and in such case it would be the duty of the defendant to ship these cars all of the way by rail and deliver them at Norfolk, Va., with the contents in the cars, or else be liable for such damage as might occur by reason of their deviation from the understanding that had been made. * * *

"In determining who is right concerning the oral contract, you should take into consideration all of the surrounding circumstances, the time of the year, the object and the purpose for which refrigerator cars were ordered, the manner in which they were protected and loaded, the rights of the parties concerning

the use of the cars at Norfolk on their arrival, and all other facts that will show you what the object and purpose of these parties were at the time the refrigerator cars were ordered and furnished, and from such facts and the papers you are to determine whether there was a prior oral agreement, and whether the defendant did agree to ship the cars all rail to Norfolk.

"The printed matter which appears upon the back of the contract that was made in this case must be taken as a part of the conditions of the contract, and by which it appears these parties had 48 hours as a reasonable time in which to take the potatoes from the car after it reached Norfolk, and as much further reasonable time as they might desire by paying demurrage fees of so much for each day. I do not mean by that a man can, for weeks or months, regardless of the necessities of the occasion, keep cars in demurrage, and still say that the company would be held for what might happen to them during that time. The reasonable time fixed by both parties in which some attention should have been paid to the matter was 48 hours.

"Provided, now, that their minds met, and that they agreed upon the shipping that was finally made. If the shipping was not made over the road as agreed upon as indicated by the plaintiffs, then, of course, there is a different theory will obtain in this case; there is a greater liability as against the defendant. A party shipping in the ordinary way, by rule they would have their 48 hours in which to make some move to protect their potatoes or remove them, and further time for their removal and protection if it becomes necessary by paying demurrage rates, which is an extension of freight rates to them."

To state the claim of defendant more in detail it is that the cars ordered and furnished were Baltimore & Ohio cars, and that the station agent explained to the manager of the plaintiff that these cars could go no farther than to Baltimore, when the potatoes would be transferred to the packet steamer and thus conveyed to their destination at Norfolk. He also testi-

fied that he put this routing in the bills of lading which he delivered to the plaintiff, and when they were produced they so show, but plaintiff explains that he did not notice the routing in them, and testified that he never heard of the packet steamer line until notified by the consignee that the potatoes came by the packet steamer line.

The claim of the station agen⌄ would seem to be corroborated, not only by the bills of lading, but by the following letter:

"SARANAC, MICHIGAN, December 11, 1912.
"MR. E. ARNOLD,
    "Freight Claim Agent of the Grand Trunk Railroad,
    "Montreal.
"*Dear Sir:* We have deferred replying to your favor of November sixth relative to claim No. 36318 of $869.91 for damage by freezing of B. & O. 14597, 4137 and 14137 in which we communicated further with the consignee and I inclose you copy of his letter. We would further state our instructions to your agent at Saranac were to route cars by N. & W. which he refused to do, claiming he was compelled to route B. & O. cars Baltimore Steam Packet Co. If cars had been routed N. & W. the same as all of our previous shipments, there would have been no necessity for unloading and putting in warehouse, cars could have been heated during cold weather if necessary. We are satisfied our claim is legitimate and we shall endeavor to collect the claim. Kindly return our papers referring to ........ at once in order that we may proceed further as we may be advised.
                "Very respectfully,
                "SARANAC PRODUCE COMPANY."

The writer of the letter explained that a year had elapsed between the shipment of the potatoes and the writing of the letter, and that he must have confused subsequent talks he had with the station agent with the conversation he had at the time of the shipment.

There is a phase of the case disclosed by the record that makes it unnecessary and unprofitable to dwell

upon the contradictory claims of what was said at the time of the shipment, and whether the charge of the court based thereon is error. During the progress of the trial the plaintiff, against the objection of the defendant, was permitted to amend his declaration. The record shows the following:

"*Mr. Ellis:* We claim they were routed contrary to agreement; that they were sent over a packet line from Baltimore; that when we took them, when they were delivered over to us, instead of being delivered in the cars, they were unloaded in an open warehouse, and at that time they froze.

"*Mr. Smith:* At the time they were unloaded in Baltimore?

"*Mr. Ellis:* That is, they were frozen—I don't care whether frozen in the warehouse, but they weren't delivered to us so we could use them.

"*The Court:* Where do you claim they were frozen?

"*Mr. Ellis:* I don't know where they were frozen, but when we found them they were frozen. They were lost as we claim, and when they changed the manner in which they should have been shipped, they became warrantors; that is all."

Whatever was said or done at the time the potatoes were shipped they in fact reached Norfolk. The potatoes which were loaded December 12th reached Norfolk December 22, 1911. The potatoes that were loaded in the other car reached Norfolk December 28, 1911. They were both consigned to J. W. Leigh & Co., who were commission merchants and were to sell the potatoes, and after deducting commission and proper charges were to remit to the plaintiff the proceeds which they afterwards did, for the potatoes were not all frozen. On the same day the potatoes arrived the consignees were notified. The first load of potatoes was not removed from the warehouse until January 19th, and the other load until January 11th. The potatoes were in sacks, and upon their arrival were put into the warehouse. The monthly weather reports

kept for the United States department of agriculture show the maximum and minimum temperatures between December 22, 1911, and January 4, 1912, to be 70 degrees and 30 degrees, respectively. These reports further show that upon but two occasions between the above-mentioned dates did the temperature at Norfolk reach the freezing point, namely, December 28th, 32 degrees, and December 29th, 30 degrees for part of the 24 hours. The weather report shows:

| Date. | Maximum. | Minimum. |
|---|---|---|
| January 5 .................... | 37 degrees | 11 degrees. |
| "       6 .................... | 21   " | 11   " |
| "       7 .................... | 33   " | 17   " |
| "       8 .................... | 53   " | 21   " |
| "       9 .................... | 48   " | 28   " |
| "      10 .................... | 42   " | 25   " |
| "      11 .................... | 39   " | 30   " |
| "      12 .................... | 34   " | 20   " |
| "      13 .................... | 20   " | 13   " |
| "      14 .................... | 26   " | 14'  " |
| "      15 .................... | 31   " | 20   " |
| "      16 .................... | 26   " | 11   " |
| "      17 .................... | 36   " | 10   " |
| "      18 .................... | 53   " | 35   " |
| "      19 .................... | 60   " | 32   " |

During this cold weather J. W. Leigh, one of the consignees, went to the warehouse to protect the potatoes as appears in his testimony.

The deposition of Mr. Leigh was offered in evidence by the plaintiff. In it appears the following:

"Q. In what condition were these potatoes when they arrived here (Norfolk)?

"A. I could not say positively. They arrived at a time when potatoes were not selling, just around the Christmas season, and I had no reason to suppose there was anything wrong with them, and I do not think I went to look at them just at that time; I am not positive of that. I was making efforts to sell the potatoes, and, as I said, I had no reason to suppose there was anything wrong with them. * * * The

cold weather set in, I think, about the 4th, or 5th of January. I got some tarpaulin and put over one lot, and the other lot I do not know whether I could get anything to put over that or not, I think I put some bags over it, the only thing I could get hold of at that time. The weather was very cold, colder than we had experienced for a number of years. I think the river was frozen at the time. I knew the potatoes were frozen as soon as the cold weather came on. I didn't know to what extent, as I couldn't tell that until the weather moderated. When the weather moderates frozen potatoes start running water.

"*Q.* Did you make every effort to try to sell the potatoes in the meantime?

"*A.* Yes.

"*Q.* Why were you not successful?

"*A.* The produce trade were not buying potatoes at that time. It was during the holiday season, and trade were buying holiday goods. * * * I don't recall the day I went down to the dock and took the precautions I have testified to. I don't recall the date, but it was when the weather seemed cold enough to require it. I was familiar with the location of the dock, and was there a number of times. I knew the sort of warehouse it was, and the facilities that the steamboat people had for storage. I may have received additional notices from the company of the shipments and a request to receipt for them and remove them. * * * I made no protest to the Baltimore Steam Packet Company, as I remember, concerning the location of these potatoes in their warehouse. So far as I could see one part of the warehouse was as good as another.

"*Q.* If you had disposed to do so, could you have removed these shipments at any time after their arrival in Norfolk by payment of the freight?

"*A.* Yes, if I had a place for them.

"*Q.* But having no place for them, and having no sale for them, you allowed them to remain there until you could sell them late in January?

"*A.* Yes."

The case of the *United Fruit Co.* v. *Transportation Co.,* 8 L. R. A. (N. S.) 240, 104 Md. 567, 65 Atl. 415,

10 Am. & Eng. Ann. Cas. 437, is one in which various questions involved in the case before us are discussed. In the opinion appears the following:

"There is a decided conflict in the authorities as to when the carrier's liability as such ceases and its liability as warehouseman only begins. One class of cases adopts what is known as the 'Massachusetts rule,' while another class of cases follows what is called the 'New Hampshire doctrine.' The Massachusetts rule is this: When the transit is ended, and the carrier has placed the goods in his warehouse to await the delivery to the consignee, his liability as carrier is ended also, though no notice is given to the consignee, and he is responsible as warehouseman only. *Thomas* v. *Railroad Corp.*, 10 Metc. (Mass.) 472 (43 Am. Dec. 444), approved in *Norway Plains Co.* v. *Railroad*, 1 Gray (Mass), 263 (61 Am. Dec. 423). This rule has been adopted or followed in Georgia, Illinois, Indiana, Iowa, Missouri, North Carolina, New Jersey, and Pennsylvania. The New Hampshire doctrine holds that the carrier's liability as insurer continues after the arrival of the goods at their destination and until the consignee has had a reasonable time in which to call for and remove them, and that the carrier is bound to notify the consignee of the arrival of the goods, and that the reasonable time does not begin to run until such notice, where practicable, has been given. *Moses* v. *Railroad*, 32 N. H. 523 (64 Am. Dec. 381), where it was said, in commenting on the rule laid down in *Norway Plains Co.* v. *Railroad*, *supra*, that the Massachusetts rule was of 'a plain, precise and practical character,' but that 'by it the salutary and approved principles of the common law are sacrificed to considerations of convenience and expediency.' The lead of New Hampshire has been followed by the courts of Alabama, California, Connecticut, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Nebraska, New York, Ohio, Vermont, and Texas. * * * The precise question we are considering does not seem to have been passed on in Maryland. We adopt as the more reasonable view the New Hampshire rule, and the doctrine of the English cases; and this brings us to inquire what is a reasonable time within which,

after notice to the consignee of the arrival of the goods, he is required to remove them if he does not wish the liability of the carrier as such to terminate while the goods are still actually undelivered. 'Reasonable time' has been defined as being such time as would enable one who resided in the vicinity of the place of delivery, and was informed of the probable time of the arrival of the goods and of the course of the carrier's business, to inspect and remove the goods during business hours. 5 Am. & Eng. Enc. Law (2d Ed.), p. 270, and cases cited in note 3. Thus where the consignee was notified after 10 o'clock Saturday morning of the arrival of his goods, and the day was a very stormy one, it was held that a finding that the following Monday morning was a reasonable time for removal would not be disturbed on appeal. *Solomon v. Steamboat Co.,* 2 Daly (N. Y.), 104. In *Lemke* v. *Railway Co.,* 39 Wis. 449, where it appeared that the goods arrived at the place of destination on a Saturday evening, and were destroyed by an accidental fire on the Tuesday following, about noon, it was held that the owner had had a reasonable time in which to remove them, and that the company's liability as insurer had ceased. In the case at bar the goods arrived early on Friday morning, and notice of their arrival was given to the consignee some time before noon of the same day. There was the rest of that day and the whole of the ensuing day, Saturday, during which the consignee could have removed the goods from the wharf of the appellee. That period was a reasonable time within which the consignee could have removed the goods. When the facts are undisputed, the question of what is a reasonable time is one of law. 6 Cyc. p. 455, note 47."

In that case it was held that a delay of 1½ business days after notice to a consignee of the arrival of his goods terminates the liability of the carrier as such. In the notes there is an interesting discussion, citing cases, as to what constitutes reasonable time.

In the case of *Stapleton* v. *Railway Co.,* 133 Mich. 187, there is a discussion of the duties and liabilities of carriers of goods and of consignees of goods; with

quotations from many standard authorities. The case is so accessible that we content ourselves by referring to it. One may scan the record of the case before us in vain for any testimony from which the inference may be fairly drawn that the potatoes were frozen previous to the 5th day of January, 1912. At that time one load of them had been in the warehouse to the knowledge of the consignee more than six days, and the other one more than 12 days. It is not believed a case can be found in the books that holds the carrier liable under such circumstances. As to the Norfolk shipment the trial judge should have directed a verdict in favor of the defendant.

· We may now consider the shipments made to Pittsburg. These shipments were made in refrigerator cars in which stoves might have been placed but were not. One of the cars was consigned January 5, 1912. It arrived at Pittsburg January 13th, and the consignees were notified at once. Some of the potatoes were frozen. The second car was consigned February 28th, and arrived early in the morning of March 9th, and within two hours the consignees were notified. Some of these potatoes were frozen.

It is the claim of the plaintiff that each of these cars should have reached Pittsburg three days earlier than they did, and that because of the delay the defendant should pay for the frozen potatoes. It is not shown at what time the potatoes were frozen.

In the case of the *Michigan Cent. R. Co.* v. *Burrows,* 33 Mich. 6, a claim was made for damages because of the freezing of apples which it was claimed was caused by delay in transportation. In the opinion occurs the following:

"If in the ordinary course of events a certain result usually follows from a given cause, then we may well consider the immediate relation of the one to the other to be established. Cold, freezing weather does not,

however, in the ordinary course of events, follow from mere delay; such is not the natural and direct result of the delay. It is true that in certain climates and at certain seasons such an injury would be much more likely to result from delay, while at others there would be not even a possibility of such a result following. It is very evident, therefore, that as we approach the one or the other we must enter upon debatable ground, where it would be very difficult, if not indeed, impossible, to say what the result of a given delay would be. Where fruit is to be carried a long distance, especially in such a country as this, where the climate is so changeable, it would as frequently result that delay would be the cause of averting such an injury as of contributing to it. It may be true that had there been no delay whatever on the part of defendant, the loss would not have happened. The law, however, cannot enter upon an examination of, or inquiry into, all the concurring circumstances which may have assisted in producing the injury, and without which it would not have occurred. To do so would only be to involve the whole matter in utter uncertainty, for when once we leave the direct, and go to seeking after remote causes, we have entered upon an unending sea of uncertainty, and any conclusion which should be reached would depend more upon conjecture than facts. Lord Bacon said: 'It were infinite for the law to consider the causes of causes, and their impulsions one of another; therefore it contenteth itself with the immediate cause, and judgeth of acts by that, without looking to any further degree.' Bacon's Maxims. The following cases are so directly in point, and the reasoning therein so satisfactory, that a reference thereto will render any farther discussion unnecessary: *Denny* v. *Railroad Co.*, 13 Gray [Mass.], 481 (74 Am. Dec. 645) ; *Railroad Co.* v. *Reeves*, 10 Wall. (U. S.) 176; *Morrison* v. *Davis & Co.*, 20 Pa. 171 (57 Am. Dec. 695) ; *Hoadley* v. *Transportation Co.*, 115 Mass. 304 (15 Am. Rep. 106)."

In the recent case of *Lardie & Son* v. *Railroad Co.*, 192 Mich. 77 (158 N. W. 31), the defendant was sued to recover damages for the freezing of potatoes. Justice KUHN, speaking for the court, cited with approval

the case of *Michigan Cent. R. Co.* v. *Burrows, supra,* and it was held there was no liability. See, also *Herring* v. *Railroad Co.*, 101 Va. 778 (45 S. E. 322).

In the instant case can it be said with any certainty that if the potatoes had reached Pittsburg within the five days which it is conceded it should have taken to reach there, none of them would have been frozen? We think the answer would have been mere conjecture. Applying the principles stated in the cases cited to the case before us, we think the trial judge should also have directed a verdict as to the Pittsburg shipments in favor of the defendant.

The case is reversed; and, as no different case is likely to be made on a new trial, none will be granted. The appellant will recover costs.

KUHN, C. J., and STONE, OSTRANDER, BIRD, STEERE, BROOKE, and FELLOWS, JJ., concurred.