## ALCOA STEAMSHIP CO. v. UNITED STATES.

### No. 257, Docket 21319.

United States Court of Appeals
Second Circuit.

Argued May 6, 1949.

Decided June 29, 1949.

AUGUSTUS N. HAND, Circuit Judge, dissenting.

———◇———

Wood, Molloy, France & Tully, New York City, and M. J. France, New York City, for appellee.

H. G. Morison, Asst. Atty. Gen., John F. X. McGohey, U. S. Atty., New York City, Leavenworth Colby, Edward L. Smith, Sp. Assts. Atty. Gen., and William H. Postner, for the United States.

Kirlin, Campbell, Hickox & Keating, New York City (L. De Grove Potter and Walter P. Hickey, New York City, of counsel) filed brief as amicus curiae.

Before L. HAND, Chief Judge, AUGUSTUS N. HAND and FRANK, Circuit Judges.

L. HAND, Chief Judge.

The question in the case is whether the United States overpaid the freight due to the petitioner, Alcoa Steamship Company, Inc., upon a cargo of lumber shipped upon the petitioner's ship, "Gunvor." The United States paid the agreed freight on the cargo in question, but later deducted the same amount from other freights, concededly due the petitioner upon other shipments; and it has sued to recover the deduction. The facts out of which the claim arises are as follows: On June 13, 1942, the "Gunvor," at Mobile lifted a cargo of lumber bound for Trinidad under a "government form" bill of lading; and on the first day out she was sunk by enemy action and she

and her cargo became a total loss. In spite of the carrier's failure to complete the voyage, the United States paid the freight on September 25, 1942, and the only issue is whether the freight had been earned. That concededly depends on the proper reading of the bill of lading, the important passages in which were the first of seven "Conditions" and the second of seven "Instructions," all upon the back of the bill. The first "Condition" was as follows: "Prepayment of charges shall in no case be demanded by carrier, nor shall collection be made from consignee. On presentation to the office indicated on the face thereof of this bill of lading, properly accomplished, attached to freight voucher prepared on the authorized Government form, payment will be made to the last carrier, unless otherwise specified."

The second of the seven "Instructions," so far as it is important here, was as follows: "The consignee on receipt of the shipment will sign the consignee's certificate on the original bill of lading and surrender the bill of lading to the last carrier. The bill of lading then becomes the evidence upon which settlement for the service will be made." The "consignee's certificate" was a "certificate of delivery" spread on the face of the bill, which declared that the consignee had received the goods; but in the case at bar, in place of such a declaration, the following words were substituted: "SS. 'Gunvor' has been lost due to enemy action." The consignee —the District Engineer, United States Engineers Office, Port of Spain, Trinidad— signed the certificate so altered on August 8, 1942; and freight was paid, when the carrier presented the bill of lading, after receiving it from the District Engineer so endorsed.

■ The United States relies upon these documents, taken in conjunction with the well-settled law that freight is never earned until the cargo is delivered.[1] The carrier answers that the bill of lading had incorporated by reference the carrier's "usual form" of bill of lading which provided that "full freight to destination, whether intended to be prepaid or collected at destination" is "due and payable * * * as soon as the Goods are received for purposes of transportation; and the same * * * shall be deemed fully earned and due and payable to the Carrier at any stage, before or after loading, of the service hereunder, without deduction (if unpaid). Goods or vessel lost or not lost. * * *" That is the customary stipulation in bills of lading; and the language alleged to incorporate it into the government bill is the second of the "Conditions," which was as follows: "Unless otherwise specifically provided or otherwise stated therein, this bill of lading is subject to the same rules and conditions as govern commercial shipments made on the usual forms provided therefor by the carrier." The first issue is whether the language quoted from the first "Condition" "specifically provided" "otherwise" than that "full freight * * * should be due and payable * * * as soon as the Goods are received for purposes of transportation." The Comptroller-General had ruled in April, 1942, when certain consignees in the Philippines could not be found because of war conditions, but, when the goods were in fact delivered at destination, that the freight had been earned, although obviously the carrier had not performed the first "Condition" to the letter. On the other hand the petitioner had had warning from the same official that in the circumstances here in question recovery was still an open question. We do not think that the administrative rulings should have any substantial weight in our decision.

■ It will be noted that the carrier's "usual form" provided that full freight should become "due and payable" as soon as it received the goods "for purposes of transportation," which would mean that the United States would become liable for the entire freight, not when the ship lifted the lumber, but even from the moment it came into the carrier's possession. In order to construe the first "Condition" consistently with such a result, we must first read the words: "Prepayment of charges shall in no case be demanded," as referring only to the time when the carrier

---

[1] The Gracie D. Chambers, 248 U.S. 387, 39 S.Ct. 149, 63 L.Ed. 318.

may ask for payment, and not as imposing any condition upon the obligation itself. True, the "usual form" covered, not only situations in which freight was "intended to be prepaid," but those in which it was to be "collected at destination"; but it appears to us, even though the words we have just quoted from the "Condition" stood alone, that it would be very unnatural to construe them as applying only to the time of payment of an absolute obligation. We can see no reason why the United States—which drew the bill—should wish to defer the payment of a claim which it must inevitably pay at some time. It was not, like a private person, in need of any extension of its credit. Why, if the freight was earned upon mere delivery, should it be interested in postponing its collection? However, the words did not stand alone, and those that immediately followed prove that, at least in one important respect, the substance of the obligation was changed. The sentence went on to say that no "collection shall be made from the consignee," and that deprived the carrier of its ancient lien for freight. It must give up the goods to the consignee upon getting his signature to the "certificate of delivery," and receiving from him the bill so signed. Only then did the bill of lading, "properly accomplished," become "the evidence upon which settlement for the service will be made." The petitioner seeks to limit these conditions to cases where the goods have in fact been delivered to the consignee. We cannot agree. As we have said, the denial to the carrier of its lien for freight had nothing to do with the time of payment; and to interpolate into the other language the necessary limitation appears to us gratuitous and quite unwarranted. Rather we think that the "Condition" and the "Instruction" together constitute a carefully devised plan by which the United States, not only asserted the privilege of any shipper under the admiralty law that it should not pay for what it does not get; but went even further by depriving the carrier of one of its best established privileges. Nor is this result unjust to, or hard upon, the petitioner. The law throws upon all carriers the risk of performance, for performance is a

condition upon the shipper's promise to pay, just as performance is always a condition upon payment in any contract of service. True, it has become general for carriers to reverse this, and throw the risk upon the shipper; but, although we do not know why this has happened, surely there is ground for supposing that it may have been because of the carrier's superior bargaining position. So far as it has become a well settled custom, the burden may be distributed by insurance with that as a datum; but it was not unnatural for the United States, if its own insurer, to wish to have the privileges which the law gives to shippers in general.

The second point on which the United States relies is that statute [2] which provides that "in all cases of contracts for the performance of any service * * * payment shall not exceed the value of the service rendered." Did this forbid the United States to deliver any goods to a carrier under a bill of lading of the "usual form"? Maybe not; it is at least plausible to say that, if the industry concerned accepts mere delivery of the goods to the carrier as a service whose "value" is the whole freight, and throws upon the shipper the risk of performance, and if no provision to the contrary is made by the parties, delivery is a "value" which will satisfy the statute. Nor in that event would it be an "advance of public money," if the United States, as shipper, paid the freight when the carrier accepted the goods. However, since in the case at bar the parties did specifically provide to the contrary by declaring what the services should be on which payment depended, we may leave the question unanswered.

Decree reversed; petition dismissed.

AUGUSTUS N. HAND, Circuit Judge (dissenting).

The bill of lading issued by Alcoa Steamship Company, Inc., clearly provided for the payment of freight whether or not the vessel was lost. Such a provision now general in commercial bills of lading must govern "unless otherwise specifically provided or otherwise stated" in the govern-

---

[2] § 529, Title 31 U.S.C.A.

ment bill of lading. In other words, the company bill of lading should prevail unless clauses in the bill of lading prepared by the government, and therefore to be construed against it in resolving any ambiguities, "specifically" have provided otherwise. I do not think that the clauses in the government bill of lading have "specifically" provided otherwise. At best, they seem ambiguous and in fact to fall short of any clear provision that in terms relieves the government from the precise exemptions in the carrier's bill of lading.

I cannot see that the general maritime rule that freight is not earned until cargo is delivered has anything to do with such a situation as we have here. That rule does not apply to cases where there is an agreement to the contrary. Allanwilde Transport Corp. v. Vacuum Oil Co., 248 U.S. 377, 39 S.Ct. 147, 63 L.Ed. 312, 3 A.L.R. 15; International Paper Co. v. The Gracie D. Chambers, 248 U.S. 387, 39 S.Ct. 149, 63 L.Ed. 318. Nor do I see that the provisions of Condition 1 or Instruction 2 control the case at bar. Instruction 6 says that: "In case of loss or damage to property while in the possession of the carrier, such loss or damage shall, when practicable, be noted on the bill of lading or certificate in lieu thereof, as the case may be, before its accomplishment." Condition 1 and Instruction 2 relate only to the mode of settlement when the freight has been delivered. Instruction 6 apparently deals with a case where there has been partial delivery, and seems to involve the assumption that there may be instances where there is a partial loss for which freight charges may be collected under the terms of the commercial bill of lading. Instruction 6 does no more than require a notation of such a partial loss on the government bill of lading and contains nothing to indicate that such partial loss would prevent the bill of lading from being "properly accomplished."

I am not convinced that there was no reason for the provision in Condition 2 that "prepayment of charges shall in no case be demanded by carrier, nor shall collection be made from consignee," unless it was intended that freight charges were never to become due except in the event of the successful completion of the voyage. The government may have had financial reasons for barring prepayment of charges and for only allowing collection from itself rather than from the consignee, and I see no reason for supposing that it was indifferent to the financial benefits it might obtain through a delay in payment. The agreement that freight charges were to be paid only after delivery in cases where the voyage had been successfully accomplished did not in terms affect the substantive right of the carrier to earn and ultimately to receive the freight, and related only to time of payment. It is true that the clause presupposes the loss of the carrier's lien because the latter was bound to deliver the cargo, in the absence of excusable loss, and to look only to the government for payment. But the loss of a lien was quite unimportant when the government was the obligor.

For the foregoing reasons, I think Condition 1 and Instruction 2 were insufficient to override the plain provision of the commercial bill of lading.

Moreover, only two months before the shipment in the case at bar the Comptroller General made a ruling regarding a shipment by the United States to the Philippines which apparently arrived shortly before the Japanese took possession, where the government and commercial bills of lading were identical with those we have under consideration. The Secretary of the Navy had asked for instructions from the Comptroller General as to whether he should pay the freight where the vessel had reached the Philippines, but there was no proof that the cargo had been received by the consignee or that the latter had receipted for it upon the bill of lading. The instructions of the Comptroller to the Secretary were as follows: "* * * you are advised that this office will not be required to object to the payment, otherwise proper of carriers' bills for transportation charges on shipments to the Phillippine Islands or Guam in instances where the original bill of lading or other form of receipt showing delivery to the consignee cannot be obtained, if a satisfactory showing be made of facts or circumstances reasonably establishing the carriers' inability, by reason of war, to effect delivery and obtain a receipt from the consignee, where the claim in each

instance is supported by a memorandum copy or shipping order copy of the bill of lading showing the material shipped and corresponding in pertinent detail with the memorandum copy duly signed by the carrier's agent and retained administratively as contemplated in the instructions on the reverse of the original bill of lading. * * *" [21 Comp.Gen. 909, 913.]

Even though we do not regard the above ruling as controlling our interpretation of the bill of lading in the present case, it at least shows that the meaning of the government bill of lading was sufficiently doubtful to lead the Comptroller to treat the provisions of Condition 1 and Instruction 2 as subject to exceptions and defenses where delivery could not be completed owing to war conditions.

For the above reasons, I think the decision of the court below was right and should be affirmed.