**UNITED VAN LINES, INC.**

v.

**UNITED STATES of America, Appellant.**

**No. 23589.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 18, 1970.

Decided July 29, 1971.

---

Mr. James C. Hair, Jr., Atty., Department of Justice, with whom Messrs. Thomas A. Flannery, U. S. Atty., and Robert V. Zener, Atty., Department of Justice, were on the brief, for appellant. Messrs. John A. Terry and Nathan Dodell, Asst. U. S. Attys., also entered appearances for appellant.

Mr. Thomas M. Knebel, Washington, D. C., for appellee.

Before MacKINNON and WILKEY, Circuit Judges, and CHRISTENSEN,* U. S. District Judge, District of Utah.

MacKINNON, Circuit Judge:

Appellee United Van Lines, Inc. (hereinafter United), a common carrier by motor vehicle, sued the United States in the District Court under the Tucker Act [1]

---

* Sitting by designation pursuant to 28 U.S.C. § 292(c).

[1]. 28 U.S.C. § 1346(a) (2) (1964) provides:

The district courts shall have original jurisdiction, concurrent with the Court of Claims, of * * * Any * * * civil action or claim against the United States, not exceeding $10,000.00 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

to recover $549.28 allegedly due for services performed under a Government bill of lading. In accordance with the terms of the bill, tendered by the transportation officer at Wright-Patterson Air Force Base, Ohio, United went to the home of First Lieutenant George P. Roys, packed his household goods, loaded them aboard a truck and transported them to Huntsville, Alabama. There, again in accordance with the terms of the bill, United placed the goods in storage in a warehouse to await ultimate delivery by United to Roys at his new home. United then billed the Government for the packing and transportation services it had performed to that point, a total of $549.28. Said amount was paid to United by the Government on February 4, 1963.

Unbeknownst to the Government, however, the Huntsville warehouse had burned to the ground on January 13, 1963, totally destroying Roys' goods.[2] Under contractual provisions which will be discussed below, United was liable to Roys for the stipulated value of the goods and it settled this liability by paying him approximately $2,000 on February 11, 1963.[3]

Following an audit by the GAO, the Government discovered that Roys' goods had been destroyed in the fire and, by letter dated July 26, 1963, demanded that United refund the $549.28 it had been paid on February 4. United refused and on June 1, 1964, the Government deducted said amount from sums it owed United for other unrelated transportation services. On July 22, 1966, United filed this suit against the United States to recover the money so deducted,

claiming that under its contract with the the Government it was entitled to the $549.28 despite the fact that the goods had never reached the home of Roys and that the deduction of that sum by the Government from other accounts amounted to a breach of contract. Both parties filed motions for summary judgment. The Government's motion was dismissed, judgment was entered for United and this appeal followed.

The Government here argues vigorously, as it did below, that the common-law presumption applicable to a contract of carriage is that the parties did not intend that any freight would be due unless and until the goods reached their ultimate destination.[4] While this presumption can be altered by contract, the Government argues that the terms of the bill of lading under consideration make clear the fact that no alteration was here intended by the parties. For the latter proposition, it relies heavily on Alcoa Steamship Co. v. United States, 338 U. S. 421, 70 S.Ct. 190, 94 L.Ed. 225 (1949).

We need not engage in an extended discussion of common-law presumptions or of the intricacies of the law of earned freight, for, like the Court in *Alcoa*, we are presented with a detailed agreement containing the understanding of the parties with regard to the conditions which gave rise to the Government's obligation to pay. However, because the bill of lading used here is substantially similar to the one used in *Alcoa*, a somewhat extended discussion of that case is necessary.

In *Alcoa*, petitioner's ship was carrying a cargo of lumber under a Govern-

---

2. The record does not indicate whether United billed the Government for its services before or after the goods were destroyed, or, if the latter, whether it knew at the time it did so that they had been destroyed. Fraud, however, was not an issue in the case as argued here.

3. See page 1198, *infra*. The bill of lading expressly made all charges dependent on the applicable tariff. The value of the goods was stipulated in that tariff to be $ .30 per pound unless otherwise expressly declared. The total weight of

Roys' shipment was 6420 pounds and United paid him $1,926.00 for their loss.

4. *E. g.*, Brittan v. Barnaby, 62 U.S. (21 How.) 527, 16 L.Ed. 177 (1858); Baggett Trans. Co. v. United States, 319 F.2d 864, 162 Ct.Cl. 570 (1963); Southern Pac. Co. v. United States, 67 Ct.Cl. 414, cert. denied, 280 U.S. 567, 50 S.Ct. 26, 74 L.Ed. 620 (1929). *See generally* 4 S. Williston, A Treatise on the Law of Contracts § 1101 (Rev.ed.1936); 13 Am.Jur.2d Carriers § 462 (1964); 13 C.J.S. Carriers § 317 (1939).

ment bill of lading when it was torpedoed and sunk somewhere between Mobile, Alabama, and Trinidad, with a total loss of cargo. Alcoa nevertheless submitted a claim for freight to the Government and the claim was paid. Following an audit by the GAO, however, the Comptroller General disallowed the payment on the ground that freight had not been earned and offset the amount paid against other amounts owed to Alcoa. Alcoa then sued the United States to recover the amounts offset and the Supreme Court affirmed the decision of the Court of Appeals for the Second Circuit [5] denying recovery.

Insofar as its discussion is pertinent to the instant case, the Supreme Court reached the result that it did because of its reading of several terms of the bill of lading covering the shipment of the lumber. The first term was "Condition 1" on the reverse side of the bill, a "Condition 1" substantially the same as the "Condition 1" appearing on the reverse side of the bill here under consideration. That condition in the *Alcoa* bill stated:

Prepayment of charges shall in no case be demanded by carrier, nor shall collection be made from consignee. On presentation to the office indicated on the face hereof of this bill of lading, properly accomplished, attached to

freight voucher prepared on the authorized government form, payment will be made. * * * [6]

Its effect, the Court said, was that it

expressly conditions payment upon submission of two documents, the bill of lading "properly accomplished," and a freight voucher prepared on the authorized government form.[7]

In turn, the Court found that the manner of "proper accomplishment" of the bill was governed by three other terms of the bill, all of which have their substantial equivalents on the bill in issue here. "Instruction 2," on the reverse of the bill, stated:

The consignee *on receipt of the shipment* will sign the consignee's certificate on the original bill of lading and surrender the bill of lading to the last carrier. The bill of lading *then* becomes *the* evidence upon which settlement for the service will be made.[8]

The consignee's certificate, printed on the face of the bill, and labeled a "Certificate of Delivery," stated:

I have this day *received* * * * the public property described in this bill of lading, in apparent good order and condition, except as noted on the reverse hereof.[9]

5. Alcoa S. S. Co. v. United States, 175 F.2d 661 (2d Cir. 1949).

6. 338 U.S. at 425, 70 S.Ct. at 192. Condition 1 on the instant bill of lading stated:
    Prepayment of charges shall in no case be demanded by carrier, nor shall collection be made from .consignee. On presentation of this bill of lading, properly accomplished and attached to freight voucher prepared on the authorized Government form, to the office indicated on the face hereof, payment will be made to the last carrier, unless otherwise specifically stipulated.

7. 338 U.S. at 425, 70 S.Ct. at 193.

8. 338 U.S. at 426, 70 S.Ct. at 193. Instruction 2 on the instant bill of lading stated:
    * * * The consignee, on receipt of the shipment, will sign the consignee's certificate on the original bill of lading and surrender the bill of lading to the

last carrier. The original bill of lading then becomes the evidence upon which settlement for the service will be made.

9. 338 U.S. at 426, 70 S.Ct. at 193. The Certificate of Delivery on the instant bill of lading stated:
    I certify that I have this day _____ (Date of _____ received from _____ Delivery) (Name of _____ at _____ transportation Company) (Actual _____ the property describ- point of delivery) ed in this bill of lading in apparent good order and condition, except as noted on reverse hereof. * * *
    _____
    (Signature of consignee or authorized agent)

Finally, Condition 6 on the reverse side of the bill stated:

> *Receipt* of the shipment is made subject to the "Report of Loss, Damage, or Shrinkage" noted hereon.[10]

In light of these terms, the Court concluded that

> [i]n sum, "the" evidence upon which the carrier may rely for payment is the "accomplished," or surrendered, bill of lading, accompanied by the "Certificate of Delivery" signed "on receipt of the shipment," with the "receipt" subject to the loss or damage report. * * * Without receipt of the goods, the bill was not, and could not have been, filled in under the strict terms of the standard form which we have stressed, so as to be "properly accomplished" for purposes of payment to the carrier.[11]

In several other cases, the *Alcoa* result has been reached under fact situations which varied little from those present in *Alcoa* itself.[12]

If the bill of lading were here the sole embodiment of the parties' agreement, the case for adoption of the position urged by the Government would be even stronger than it was in *Alcoa* for, in addition to the terms discussed above, the following provision was printed on the face of the bill of lading:

> Received by the transportation company named above, subject to the conditions named on the reverse hereof, the property hereinafter described, in apparent good order and condition (contents and value unknown), to be forwarded to destination by the said company and connecting lines, there to be delivered in like good order and condition to said consignee.

---

10. 338 U.S. at 427, 70 S.Ct. at 193. Condition 6 in the instant bill of lading was the same as the one here quoted.

11. 338 U.S. at 427, 70 S.Ct. at 193.

12. *E. g.*, National Trailer Convoy, Inc. v. United States, 345 F.2d 573, 70 Ct.Cl.

In addition, Instruction 3 on the reverse of the bill stated:

> The consignee's certificate of delivery shall be accomplished by the consignee or other duly authorized person.

The bill of lading, however, is not here the sole source from which we must draw our conclusion concerning the precise agreement of the parties, for there was in existence at the time United commenced performance under the bill, a regulation issued by the Comptroller General [hereinafter "the regulation"] governing payment to carriers of household goods for the Department of Defense. Said regulation provided *inter alia:*

> (c) *Required certifications.* The payment of transportation charges from the point of shipment to the destination storage point o[n] shipments of household goods forwarded for account of the Department of the Army, the Department of the Navy (including the Marine Corps), or the Department of the Air Force and stored in transit for account of the motor carrier and for ultimate delivery to the consignee or owner may be made upon completion of the transportation to the carrier's destination storage point and prior to ultimate delivery to the consignee: *Provided,* The carrier hauling the shipment to the destination storage point certifies on the covering Government bill of lading over the signature of its duly authorized representative:
>
> (1) That the described household goods were placed in the Carrier's storage warehouse at _____
> (Destination)
> _____ on _____;
> (Warehouse)        (Date)
> (2) That such household goods will be permitted to remain there for a period of _____
> (Number of days)

823 (1965); Strickland Transp. Co. v. United States, 223 F.2d 466 (5th Cir. 1955). *See also* 45 Op.Comp.Gen. 556 (1966).

or such shorter period as may meet the consignee's o[r] owner's demands; and

(3) That the carrier(s) hauling the shipment to the destination storage point assumes full carrier liability for the shipment during such storage and until delivery to the consignee or owner within the designated storage period.[13]

\*      \*      \*      \*      \*      \*

■■ Because the regulation was in existence at the time United entered on performance, it became, in effect, a part of the contract between the parties.[14] We conclude that it substantially modified the terms of the agreement as set forth in the bill alone. Specifically, we conclude that the regulation gave the carrier a conditional option, the exercise of which entitled it to receive *and retain* payment for services performed in advance of ultimate delivery of the goods to the consignee.

If one reads Section (c) of the regulation and Condition 1 of the bill of lading together (as they must be read), it becomes immediately obvious that United as the carrier could, at its option, obtain payment for its services by either one of two methods. If it elected to proceed under Section (c) of the regulation, it could obtain payment for the first leg of its services rendered in taking the goods from the point of origin to the storage-in-transit point without "proper accomplishment" of the bill. If it did not choose to take advantage of Section (c), however, it could wait until the goods were finally delivered to the consignee and then obtain full payment for all of its services upon presentation of a prop-

erly accomplished bill. Thus, unlike the situation in *Alcoa,* proper accomplishment of the bill—something which could only be done if and when the goods were delivered in proper condition to the consignee—was not necessarily a condition precedent to United's right to *receive* payment for part of the total transportation services it had agreed to provide in two steps.

This conclusion is not seriously disputed by the Government, which argues instead that payments made in accordance with Section (c) of the regulation were progress payments only and that United's right to *retain* such payments was dependent on its actual delivery of the goods to the consignee.

■ We recognize that a contractual provision calling for "progress payments" does not necessarily mean that a payee can retain such payments if he fails to completely perform his contractual obligation.[15] Here one of the Government's primary contentions is that United should not be allowed to retain such payments because, unless and until the consignee actually received the goods, the Government received no benefit from its contract with United. Since it would be absurd to assume that the Government agreed to pay something for nothing, we are urged to accept the view that retention of the Section (c) payments required delivery of the goods to the consignee.

The argument is not persuasive. In essence, it amounts to an argument that the constituent parts of United's total service were valueless unless the goods were finally delivered to the consignee by United. 31 U.S.C. § 529,[16] however,

---

13. 4 C.F.R. § 52.30(c), 22 Fed.Reg. 10903 (1957). The regulation, as modified, presently appears at 4 C.F.R. § 54.42 (1971).

14. *E. g.,* Farmers' & Merchants' Bank of Monroe, N. C. v. Federal Reserve Bank, 262 U.S. 649, 660, 43 S.Ct. 651, 67 L.Ed. 1157 (1923); United States v. Essley, 284 F.2d 518, 520 (10th Cir. 1960). *See generally* 3 S. Williston, *supra* note 4, at § 615.

15. *See,* e. g., Westinghouse Electric Corp. v. State Tax Comm'n, 206 Md. 392, 402, 111 A.2d 661, 666 (1955). *See also* Heinse v. Howard, 153 Md. 380, 138 A. 255 (1927); S. Williston, *supra* note 4, § 861 at 2411–12.

16. 31 U.S.C. § 529 (1964) provides in pertinent part:
    No advance of public money shall be made in any case unless authorized by

forbids payments on Government contracts in excess of the "value of the service rendered \* \* \* previously to such payment." The statute was intended "to prevent a department from anticipating the performance of an obligation." [17] If we were to agree with the Government that United's performance—and by implication the performance of every carrier of household goods—was valueless unless the consignee received the goods, then Section (c) of the regulation would appear to violate 31 U.S.C. § 529.

It is clear to us that the services performed by United prior to the destruction of the goods did have some value. The goods were picked up, packed and transported to within a few miles of their ultimate destination. Had United simply refused to carry out its part of the bargain after it had delivered the goods into storage, it would be easier to see that the services it had performed to that point were of some value to the Government. In such a case, United would have moved the goods a substantial part of the way from the consignee's old home to his new one, and the Government would be that much closer to a complete discharge of the obligation it had undertaken to arrange for the transportation of the consignee's goods. In

practical terms, it may well be that the destruction of the goods while they were in storage erased any benefit from United's services. Contrary to the Government's suggestion, however, that erasure only raises the crucial question in this case; it answers none. Whether United was entitled to retain Section (c) payments despite the destruction of the goods depends on whether United or the Government bore the risk of losing the value of the services rendered by United in moving the goods from Ohio to the warehouse in Huntsville. That question is distinct from the question of which party bore the risk of loss of the goods themselves, for Section (c) makes clear that that risk was borne by United. Like the answer to the latter question, however, the question of which party bore the risk of losing the value of the transportation services must be answered by reference to the agreement between the parties.[18] The agreement convinces us that, once the goods were delivered into storage and United complied with the terms of Section (c), the risk of losing the value of the transportation services shifted from United to the Government.[19]

In the first place, the regulation does not expressly deal with the carrier's failure to deliver the goods to the consignee

the appropriation concerned or other law. And in all cases of contracts for the performance of any service \* \* \* payment shall not exceed the value of the service rendered \* \* \* previously to such payment.

17. McClure v. United States, 19 Ct.Cl. 173, 181 (1884). *See also* 10 Op.Att'y Gen. 288, 301 (1862). The argument that 31 U.S.C. prohibited payment of the freight charges before delivery of the goods was made by the *Government* in *Alcoa,* but the Court found it unnecessary to decide the point. Alcoa S. S. Co. v. United States, 338 U.S. 421, 425 n. 6, 70 S.Ct. 190, 94 L.Ed. 225 (1949).

18. The Supreme Court in *Alcoa* was in effect addressing itself to the same question. Its holding that "the bill of lading's specific conditions for payment can only be satisfied upon delivery of the shipment to destination," 338 U.S. at 429, 70 S.Ct.

at 194, was tantamount to a holding that the bill placed the risk of loss of the value of the transportation services on the carrier until the goods were delivered.

19. Though the cases are not controlling here, courts have held in other contexts that a promisor may recover the value of services rendered even though it fails to fully perform its obligations and even though the contract is not divisible. Bell v. Carver, 245 Ark. 31, 431 S.W.2d 452 (1968) ; Kaufman v. Gray, 135 A.2d 455 (D.C.Mun.App.1967) ; Clough v. A. J. Stillwell Meat Co., 112 Mo.App. 177, 86 S.W. 580; Annot., 170 A.L.R. 980 (1947) ; Annot., 28 A.L.R.3d 788 (1969). Whether or not such a result is reached in a given case does not necessarily turn on whether the promisee retains some of the value of the partial performance. 6 S. Williston, *supra* note 4, § 1976.

after they had been placed into storage. The effect of Section (d) of the regulation, however, is to make such delivery the condition precedent to the Government's obligation to pay any "accessorial charges" which accrued against the shipment after delivery into storage, i. e., those for storage in transit, delivery out of storage and unpacking.[20] In promulgating its regulation, then, the Government has provided, in effect, that non-delivery from storage to the consignee *only* constitutes non-fulfillment of the condition which gives rise to its obligation to pay sums *in addition to* those paid under Section (c). Since the regulation was drafted by those charged with the primary responsibility for the household goods shipping program, and since it has been carefully amended several times, we assume that it means what it says. We are reluctant, therefore, to read it as if it contained additional terms providing that final non-delivery was a condition subsequent which defeated the carrier's right to retain payments made under Section (c).

Secondly, the amounts paid under Section (c) of the regulation are not simply arbitrary percentages of the total amount which will be due when the goods are finally delivered to the consignee. Rather they are specific amounts payable under the applicable tariff for identifiable components of the carrier's total service. As such, they constitute the basis agreed upon for each of the services United undertook to render in performing its total contractual obligation.[21]

Thirdly, while the services performed by United up to the point at which the goods were delivered into storage undoubtedly could be split into a great number of identifiable parts, each of which might have a separate tariff price, several factors indicate that the parties intended the services to be divided into two main parts: (1) pick-up of the goods and delivery into storage and (2) delivery from storage to the home of the consignee. For example, the bill of lading indicates that a storage shed in Huntsville—not the home of the consignee—was to be the initial destination of the goods, and that they were to remain there for up to 90 days. Under the regulation, payment for all services performed to that point would be made if United chose to ask for it and payment for all subsequent services would be made after the goods were delivered to the consignee.[22] The regulation recog-

---

**20.** 4 C.F.R. § 52.30(d), 22 Fed.Reg. 10903 (1957) provides:

*Supplemental billing for accessorial charges.* When transportation charges have been paid as authorized in [Section (c)], the payment of accessorial charges, if any, accruing against the shipment after delivery into storage may be made upon presentation by the motor carrier of a claim therefor on SF 1113, which should bear the same bill number as the carrier's original bill for transportation charges. * * * The claims for accessorial charges must identify the bill of lading covering the transportation service, show the basis for the accessorial charges claimed and be supported by a statement of the following information signed by the consignee, showing:

(1) Accessorial services ordered and furnished;

(2) Receipt of the shipment by the consignee or owner; and

(3) Loss or damage to the shipment, if any.

Section (d), as modified, presently appears at 4 C.F.R. § 52.42(d) (1971).

**21.** That a contract lends itself to such an apportionment of consideration is a factor frequently considered by courts in determining whether or not a contract is divisible. *E. g.,* Jones v. Gregg, 226 Ark. 595, 293 S.W.2d 545, 550 (1956); John v. United Advertising, Inc., 165 Colo. 193, 439 P.2d 53 (1968); Boesiger v. De Modena, 88 Idaho 337, 399 P.2d 635, 641 (1965); Dredge Corp. v. Wells Cargo, Inc., 82 Nevada 69, 410 P.2d 751, 754 (1966). *See generally* 3 S. Williston, supra note 4, at § 860A; Restatement of Contracts § 266(3) (1932). *Compare* Goodman v. Newzona Invest. Corp., 101 Ariz. 470, 421 P.2d 318 (1966); A. H. Andrews Co. v. Colonial Theatre Co., 283 F. 471, 474–475 (D.C.E.D.Mich.1922); Restatement of Contracts § 266, Illustration 4 (1932).

**22.** The Government agrees that United would have been entitled to an additional

nized that United might be called upon to perform no further services after the goods had been delivered into storage.[23] It also made the type and quantity of the services for which the Government would pay dependent upon the consignee's request.[24] If no such subsequent services were requested, the regulation did not require United to make any further communication to the Government regarding the whereabouts or condition of the goods. In sum, delivery of the goods into storage is the point at which there appears a distinct and recognizable break in the total service which United was obligated to perform under the contract.

A final factor is that, in order to receive payment under Section (c), United had to assume an increased risk for the goods while they were in storage. Clearly, United had an option under the bill and regulation to demand and receive payment either when it had delivered the goods into storage or when it had delivered them to the home of the consignee.[25] If it took the former course, however, it was required by Section (c) to assume an insurer's liability for the goods while they were in storage.

The reason for this requirement seems fairly certain. The Government has undertaken to arrange the transportation of household goods belonging to military personnel when such persons are transferred from one duty station to another.[26] Having undertaken that obligation, the Government has chosen to carry it out to a large degree through the use of commercial carriers.[27] In a large number of situations, there will be some delay between the time that the goods are shipped and the time that the member of the military has secured the new home into which they are to be moved. During such time, the goods must be stored some place at either the risk of the carrier or of the Government.

In the absence of a contractual provision to the contrary, the general rule is that when goods are stored at the destination by the carrier for the convenience of the shipper, the carrier is liable as a warehouseman only for damage to the goods during the storage period, *i. e.*, he is liable for such damage only if

payment had it delivered the goods to Roys. Government's "Response to Plaintiff's Statement of Material Facts."

23. *See* note 20, *supra.* For example, the consignee might pick up the goods at the warehouse instead of having them delivered by the carrier. The consignee also might not be ready to receive the goods by the end of the storage-in-transit period. At that point, the carrier's contractual responsibilities would appear to be at end and it would be the consignee's responsibility to arrange for someone to deliver the goods from storage to his home. *Cf.* 49 C.F.R. § 1056.12(b), Storage in Transit (1970).

24. 4 C.F.R. § 52.30(d) (1), *supra* note 20, makes payment of charges for services furnished subsequent to delivery into storage dependent, *inter alia*, on the carrier's filing a claim signed by the consignee showing the services ordered by him and furnished by the carrier.

25. The Government asserts that the use of the word "may" in Section (c) of the regulation, see page 1194, *supra*, means that payments under that section were to be made entirely at the discretion of the

Government and United thus did not have an option. The Government, however, has cited no instance in which a payment demanded by a carrier under Section (c) has been refused. Moreover, the word "may" is also used in connection with payments made under Section (d) for accessorial charges. *See* note 20, *supra.* To be consistent, the Government would have to argue that Section (d) payments were also discretionary with the Government. There appear to be no other provisions governing payment of charges accruing after delivery into storage and therefore an argument that Section (d) payments are discretionary amounts to an argument that the Government has the right to refuse to pay any such charges at all. Such a result would be absurd and can be avoided by construing, as we do, the word "may" in both Sections (c) and (d) to import a promise on the part of the Government to pay on demand made in accordance with those Sections.

26. 37 U.S.C. § 406(b) (1964); *see* 32 C.F.R. §§ 173.1 to .4 (1971).

27. *See* 32 C.F.R. § 173.3(g) (1970). *Compare* 32 C.F.R. § 173.4(b) (7) (1971).

caused by his own negligence.[28] Thus, under normal circumstances, if the goods here in question had been destroyed while in the warehouse, United would have been liable for their value only if its own negligence had caused their destruction. Under Section (c), however, one of the conditions precedent to the Government's obligation to pay upon delivery into storage is the carrier's agreement to assume full *carrier* liability for the goods while they are in storage.[29] This means that, subject to certain exceptions not here relevant, the carrier becomes an insurer of the goods during storage.[30]

Thus, the scheme provided by the bill of lading and the regulation gave United two choices each of which entailed different consequences. If United chose to exercise its option and receive payment after the goods had been delivered into storage, it was required to agree to become an insurer of the goods while they remained in that position. If it chose to wait and receive payment only after the goods received by the consignee, it would be liable only for loss of the goods attributable to its own negligence.[31]

In light of the foregoing, acceptance of the Government's contention that United's retention of payments made under Section (c) was dependent upon eventual delivery of the goods to the consignee would mean that United was assuming an insurer's risk in return simply for the *use* of the Section (c) money while the goods were in storage. A more reasonable interpretation is that United shouldered the increased risk in return for the right to permanently retain the amounts it received under Section (c).

■ The sum of the above factors, then, leads us to the conclusion that United's compliance with Section (c) shifted from it to the Government the risk of loss of the value of the transportation services it had rendered prior to the destruction of the goods in the warehouse. In effect, the contract became divisible when United exercised its option to receive payments under the section.[32] Obviously, such a conclusion does not mean that, upon exercise of the option, United's contractual obligations were at end. It does mean, however, that United was entitled to retain the payments made in accordance with the regulation even though the consignee's goods were burned in the fire which destroyed the Huntsville warehouse. Accordingly, the decision of the court below is

Affirmed.

---

28. *See, e. g.*, General American Transp. Corp. v. Indiana Harbor Belt R. R., 191 F.2d 865 (7th Cir. 1951), *cert. denied*, 343 U.S. 905, 72 S.Ct. 636, 96 L.Ed. 1324 (1952) ; Railway Express Agency v. Schoen, 70 Ariz. 87, 216 P.2d 420 (1950) ; United Fruit Co. v. New York & Baltimore Transp. Co., 104 Md. 567, 65 A. 415 (1906) ; Atchison T. & S. F. Ry. v. Homewood, 39 Okl. 179, 134 P. 856 (1913). *See generally* In the Matter of Bills of Lading, 52 I.C.C. 671, 702–705 (1919).

29. 4 C.F.R. § 52.30(c) (3), *supra* pages 1194, 1198.

30. Missouri Pacific R. R. v. Elmore & Stahl, 377 U.S. 134, 137, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964) ; Secretary of Agriculture v. United States, 350 U.S. 162, 165 n. 9, 76 S.Ct. 244, 100 L.Ed. 173 (1956) ; *see* 49 U.S.C. § 20(11) (1964).

31. The answer to the question of who is to assume what risks and at what price while the goods are in storage has been an important element in the Government's determination concerning whether it would request storage-in-transit services from the carrier. *See* 32 C.F.R. § 173.3 (f) (1970).

32. *See generally* 3 S. Williston, supra note 4, §§ 860A–862; Annot., 2 A.L.R. 643 (1919). A contract not divisible when entered may become so at a later time by agreement of the parties, express or implied. Hudson v. Wylie, 242 F.2d 435, 447 (9th Cir.), cert. denied, 355 U.S. 828, 78 S.Ct. 39, 2 L.Ed.2d 41 (1957).